**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>Mario Martell Spencer, and Ahmed Osman Farah,<br><br>                Defendants. | Case No. 18-cr-114 (WMW/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

      The above-captioned case comes before the undersigned on Defendant Ahmed Osman Farah's ("Farah") Motion for Suppression of Statements [Doc. No. 37] and Defendant Mario Martell Spencer's ("Spencer") Motion to Suppress Evidence [Doc. No. 45] (collectively, the "Motions to Suppress"). The case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Officers William Martin, Thomas Chorlton, and John Haugland testified at the hearing before the undersigned. Supplemental briefing was requested, and the Court took the matter under advisement on November 2, 2018. *See* (Aug. 29, 2018 Minute Entry [Doc. No. 56]; Mot. to Extend Time to File Post-Hearing Briefs [Doc. No. 62]; Sept. 25, 2018 Order [Doc. No. 63].) For the reasons stated below, the Court recommends that Farah's Motion for Suppression of Statements be granted in part and denied in part and that Spencer's Motion to Suppress Evidence be denied.

I.  **BACKGROUND**

On March 23, 2018, two individuals robbed at gunpoint the Pennwood Market in Minneapolis.  (Tr. [Doc. No. 66 at 41].[1])  The description of the two suspects and the getaway vehicle was dispatched over the Minneapolis Police radio.  *See* (*id.* at 42–43.)  Both suspects were identified as black males and potentially armed, because it was known that a handgun was used during the robbery.  (*Id.* at 42–43, 91.)  One suspect was described as wearing a dark jacket with a hoodie, dark pants, and a mask while the second was described as wearing lighter-colored shoes and a dark jacket.  (*Id.* at 42–43.)  The vehicle was described as a gray four-door Nissan sedan driving eastbound on Glenwood Avenue.  (*Id.* at 44, 93.)

Upon hearing the dispatched information, Officer William Martin and his partner proceeded towards the Pennwood Market in an unmarked squad car equipped with lights and sirens.  (*Id.* at 41.)  While traveling westbound on Glenwood Avenue, the officers observed a gray vehicle pass them while traveling eastbound.  (*Id.* at 45–46.)  The officers turned around and began pursuing the vehicle and activated the squad car's lights and sirens.  (*Id.* at 46.)   The gray vehicle accelerated and made an abrupt turn going the wrong way down a one-way street, where it struck two vehicles.  (*Id.* at 47–48.)  The officers were traveling well over the speed limit in order to keep the fleeing vehicle

---

[1] This is a redacted transcript; a portion of the suppression hearing on August 29, 2018, was sealed.  *See* (Aug. 29 Text Only Order [Doc. No. 57] (memorializing a ruling from the bench on Farah's appointment of new counsel and sealing that portion of the transcript).)  For consistency, the Court references the redacted transcript by transcript page number and does not use CM/ECF pagination.

within eyesight. (*Id.* at 48–49.) Once on Cedar Lake Road, Officer Martin and his partner lost sight of the vehicle. (*Id.* at 49.)

A few minutes later, a passerby approached the squad car and stated they had almost been struck by a vehicle that continued traveling towards northbound Penn Avenue. (*Id.* at 50.) In response to that information, the officers drove down to Penn Avenue, turned northbound, and after a few blocks, observed that the gray vehicle they had been pursuing had crashed into a garage. (*Id.*) The garage was on the corner of First and a Half Avenue North and Penn Avenue North. (*Id.* at 51.)

Officer Martin and his partner approached the vehicle to visually search for individuals or weapons, and found neither. (*Id.* at 52.) Officer Martin stated he requested a perimeter to be set up to contain any nearby suspects. (*Id.* at 52–53.) Within minutes of positioning to form a perimeter, Officer Thomas Chorlton observed two black males running through the backyard of a home located on Second Avenue North, and began chasing them while yelling commands to stop. (*Id.* at 95–96.) Officer Chorlton observed the first individual jump over a fence, but he grabbed the second male from atop the fence and pulled him back into the yard. (*Id.* at 97.) At this point, the two individuals, who turned out to be Spencer and Farah, were apprehended separately, so each arrest will be discussed individually.

### A.     Farah

Farah was the individual pulled from the fence and the first individual taken into custody. After pulling him from the fence, Officer Chorlton testified that he had to use a few closed fist strikes to Farah's face to force Farah's hands behind his back. (*Id.* at 13–

3

22, 98.) Once handcuffed, Officer Chorlton placed Farah in the back of a squad car to wait for an ambulance. When asked for his name, Farah replied "Jesus Christ." (*Id.* at 101.) During his arrest, Farah stated to officers that he had Posttraumatic Stress Disorder and was hearing voices. (*Id.* at 115.)

### B.     Spencer

Having been informed that one suspect was in custody, five to six officers continued to search on foot, following a K9 through the alleys northbound from the garage crash site. (*Id.* at 76.) The K9 was introduced to the scent of the suspects by exposing it to both the driver and passenger sides of the crashed vehicle. (*Id.* at 155.) Then, the K9 was brought to the area in which the suspects had been last seen and instructed to track the scents to which it had just been exposed. (*Id.*) During the search, officers received updated information describing the suspect as wearing darker colored pants and a leather type jacket with a hood. (*Id.* at 10–14, 57.) While traveling eastbound through the alley located between Second Avenue North and Third Avenue North, the K9 began alerting through barking and visual cues, indicating it detected a scent. (*Id.* at 146–147.) An officer observed a male matching the updated description lying prone on the garage roof at 2021 North Third Avenue. (*Id.* at 59.) The garage roof was roughly ten feet above the ground. (*Id.* at 122.) Approximately fifteen to twenty minutes elapsed between the K9 arriving on the scene and the suspect being spotted on the garage roof. (*Id.* at 148.)

After commands to come down, the individual—later identified as Spencer—reluctantly slid towards the edge of the roof. (*Id.* at 61, 78–79.) He was pulled off the

roof by officers.  (*Id.* at 60.)  Upon reaching the ground, the suspect's hands were under his torso, making it difficult for officers to handcuff him.  (*Id.* at 124.)  Officer Chorlton administered two knee strikes to Spencer's torso to stop his resistance.  (*Id.*)  Eventually, Spencer was handcuffed, placed in a squad car, and transported to City Hall to be processed.  (*Id.* at 60–61.)

Once at City Hall, Spencer was interviewed by two officers.  When asked if he wanted to say or explain anything, Spencer stated "I don't got nothing to say" and "There's nothing to explain."  (Ex. 12. at 0:51-:59.)[2]  After these statements, the officers issued a *Miranda* warning and then proceeded with the interrogation.

At the same time the suspects were taken to City Hall for processing, officers canvassed the area for evidence.  Visible at various locations between the site of the crashed vehicle and the site of Farah's arrest, law enforcement officers discovered United States currency, Pennwood Market credit card receipts, a driver's license application in Spencer's name, and a gray/white stocking hat that had the top cut off.  (Tr. at 108–109.)  While retracing the route taken during the vehicle pursuit, Officer Martin and his partner found a handgun lying in the road east of Penn Avenue on Cedar Lake Road.  (*Id.* at 63.)  The handgun had damage consistent with the firearm having skidded across the road. (*Id.* at 63–64.)

---

[2] Exhibit 12 is video footage of Spencer's interview. A copy of which was provided to the Court at the suppression hearing. *See* (Ex. List [Doc. No. 59 at 2.])

On May 16, 2018, Defendants were indicted on Interference with Commerce by Robbery, Using, Carrying and Brandishing a Firearm During and in Relation to a Crime of Violence, and Felon in Possession of a Firearm. (Indictment [Doc. No. 1].)

## II. DISCUSSION

### A. Farah's Motion

Invoking his Fifth Amendment rights against self-incrimination, Farah seeks to suppress "[a]ll statements elicited by law enforcement following his arrest." *See* (Mem. in Supp. of Mot. to Suppress Statements by Def., "Farah's Mem. in Supp." [Doc. No. 68 at 4].) It is unclear what specific statements Farah is challenging, although it appears as if the challenged statements were made before Farah was read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See generally* (*id.*) The Court notes that arguably such generic requests for suppression are not appropriate. *See, e.g.*, *United States v. Quiroz*, 57 F. Supp. 2d 805, 822–23 (D. Minn. 1999) (Mason, Mag, J, as adopted by Kyle, J.), *aff'd sub nom. United States v. Vasquez*, 213 F.3d 425 (8th Cir. 2001).

Nevertheless, out an abundance of caution the Court reviews the statements that Farah identified to the Government in its meet and confer and statements that the Government independently brings to the Court's attention, presumably because those are the statements the Government intends to use at Farah's trial. *See* (Gov't's Mem. of law in Opp'n to Defs.' Mots. to Suppress Evidence, "Gov't's Mem. in Opp'n" [Doc. No. 73 at 10–12].) Specifically, the Government identifies certain statements broken into three general categories: (1) Farah's response that his name was "Jesus Christ" when officers asked his name; (2) Farah's statements that he had "just come home" and "didn't do

6

nothing"; and (3) Farah's requests to retrieve personal effects such as his hat and wallet. *See* (*id.*)  After careful review of the body camera footage of Farah's arrest, the Court identified additional statements made by Farah at about the same time as those identified by the Government.  Specifically, in connection with Farah's statement that "he didn't do nothing," Farah also stated that he was "innocent man" and asked "what's going on?"  *See* (Ex. 6D at 5:35-5:37; Ex. 6E at 5:31-5:33.)[3]  The Court will address whether suppression is warranted for each of these statements as well.

### 1.   Legal Standard

The Fifth Amendment states in pertinent part that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. Under *Miranda*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.  That is, "*Miranda* warnings must be given before a suspect's statements made during custodial interrogation may be admitted into evidence." *United States v. Ochoa-Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010).  This "protection encompasses *compelled* statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating."  *United States v. Hubbell*, 530 U.S. 27, 37 (2000) (emphasis added).

---

[3] Exhibits 6D and 6E were provided to the Court at the suppression hearing. *See* (Ex. List at 2.)

### 2. Analysis

There can be little doubt that Farah was in custody. He was handcuffed, not free to leave, and generally under the physical control of the arresting officers. *See Miranda*, 384 U.S. at 444 (stating a suspect is in custody when they have been "deprived of his freedom of action in any significant way"). Thus, the only question is whether Farah's statements were compelled on the basis of a custodial interrogation. Because the Court concludes that one of the challenged statements should be suppressed, the Court will recommend that Farah's motion be granted in part and denied in part.

#### a. Statements Regarding Farah's Name

First, as it relates to Farah's response to the officer's questions regarding his name, Farah responded "Jesus Christ." (Ex. 6D at 15:30-15:50; Ex. 6E 15:20-15:45.) It is well-settled in the Eighth Circuit that requests for routine information, such as the suspect's name, "is not [an] interrogation under *Miranda*, even if the information turns out to be incriminating." *Ochoa-Gonzalez*, 598 F.3d at 1038 (internal quotation marks omitted). As a result, this statement in response to the question by officers—despite the fact that Farah had not yet been read his *Miranda* rights—is not a violation under the Fifth Amendment. *Cf. id.*

#### b. Statements Regarding Farah's Innocence

Next, as it relates to Farah's statement that he was "innocent man" and "didn't do nothing, what's going on?", the video footage confirms that these were voluntary statements not made in response to interrogation. *See* (Ex. 6D at 5:35-5:37; Ex. 6E at 5:31-5:33.) Specifically, Farah's utterances were made in response to being handcuffed.

8

But it is well-settled that "[i]nterrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *see also Miranda*, 384 U.S. at 478 (stating "[v]olunteered statements of any kind are not barred by the Fifth Amendment"). Because these statements were not made in response to any other form of compulsion or coercion beyond being placed in custody, suppression of these spontaneous statements is not warranted. *Cf. Innis*, 446 U.S. at 300.

That said, the statement that Farah had "just come home," elicited by the officer's question as to why Farah was running, is a closer call. *See* (Ex. 6D at 5:37-5:43; Ex. 6E at 5:33-5:38.) In general, "[a]n officer's request for clarification of a spontaneous statement generally does not constitute interrogation." *Chipps*, 410 F.3d at 445; *see also United States v. Jackson*, 852 F.3d 764, 771–72 (8th Cir. 2017) (stating that follow-up questions regarding voluntary statements did not constitute an interrogation). This general premise, however, does not apply when the follow-up question "enhance[s] the defendant's guilt or raise[s] the offense to a higher degree." *See Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (internal quotation marks omitted). The officer's question about why Farah was running is materially different than other types of follow-up questions, such as questions concerning public safety, that are deemed not to trigger *Miranda*. *See, e.g.*, *United States v. Luker*, 395 F.3d 830 (8th Cir. 2005). Instead, this question was "reasonably likely to elicit an incriminating response," which implicates Farah's *Miranda* rights. *See United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). Because Farah was not read his *Miranda* rights prior to making this statement, the Court will recommend that Farah's statement that he had "just come home" be suppressed.

9

### c. Statements Regarding Farah's Personal Effects

Finally, as it relates to Farah's statements concerning the location of his hat and wallet, these statements are spontaneous utterances, and should not be suppressed. When the officers were inquiring about Farah's name, he continued to ask about his wallet. *See* (Ex. 6D at 15:30-15:15; Ex. 63 at 15:20-15:45) (Farah asking "can I get my wallet?" and "where's my wallet?"). But as already discussed, the officer's request for Farah's name is "not an interrogation under *Miranda*" and Farah's statements regarding his wallet were therefore not offered in the context of a custodial interrogation and should not be suppressed. *Cf. Ochoa-Gonzalez*, 598 F.3d at 1038.

Suppression is also not warranted for the statements related to Farah's hat, but for a different reason. In particular, each time Farah requested that he be allowed to retrieve his hat, Farah was being escorted to a squad car and the officers were silent when Farah made his statements. *See* (Ex. 6D at 6:25-6:35; Ex. 6E at 6:20-6:30, 8:35-8:42.) Indeed, the officers continually asked Farah to keep quiet or indicated to Farah that he should stop inquiring about the hat. *See e.g.*, (Ex. 6E at 6:20-6:30, 8:35-8:42.) In other words, there is nothing in the video footage to suggest that Farah was compelled to make these requests. Thus, suppression of these statements is also not warranted. *Cf. Hubbell*, 530 U.S. at 37.

### B. Spencer's Motion

Spencer makes two arguments for the suppression of evidence. First, he argues the officers lacked probable cause to arrest him in the first instance, that his arrest therefore was in violation of his Fourth Amendment rights, and that any items seized by a search

conducted incident to the arrest are thus tainted fruit.[4]  *See* (Mot. to Suppress Evidence at 1, 2–3.)  Second, Spencer moves to suppress statements made during his interrogation on the grounds that the statements are tainted fruit from his unlawful arrest, and that he invoked his right to remain silent in the interrogation room but law enforcement continued with the interview in violation of his Fifth Amendment rights. (Mot. to Suppress Evidence at 4); (Def. Spencer's Post-Hearing Mem. of Law in Further Supp. of his Mot. to Suppress, "Spencer's Mem. in Supp." [Doc. No. 70]; Nov. 29 Letter.) The Court addresses each argument in turn.

> 1.   **Spencer's Motion to Suppress Evidence Taken Incident to His Arrest**
>
> a.   **Legal Standard**

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[4] Spencer's pre-trial motion generally alleged violations of the Fourth Amendment on the grounds that the Government lacked probable cause to arrest him and that the search warrant for the gray vehicle also lacked probable cause.  *See* (Mot. to Suppress at 1, 2–3.) At the motions hearing, Spencer's attorney stated that she would limit "the items to be suppressed" in "post-hearing briefs." (Tr. at 31.)  A clarifying letter subsequently filed with the Court stated that the only Fourth Amendment argument being maintained was the lack of probable cause for his arrest, and further stated that Spencer specifically seeks to suppress a blue bandana and other articles of clothing that he was wearing at the time of his arrest. *See* (Nov. 29 Letter [Doc. No. 78].)  As a result, the Court deems Spencer's argument that there was insufficient probable cause to issue a search warrant for the vehicle to have been withdrawn and thus does not consider it here.

U.S. Const. amend. IV.  In order to give power to the Fourth Amendment, the Supreme Court has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).  "[T]his judicially created rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 139–40 (internal quotation marks omitted).  Stated differently, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

Under the Fourth Amendment, warrantless arrests are permitted so long as there "is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.*  Stated differently, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (internal quotation marks omitted).  Ultimately, probable cause to justify a warrantless arrest "is not a high bar."  *Cf. Kaley v. United States*, 571 U.S. 320, 338 (2014).

      **b.**    **Analysis**

The events and circumstances leading up to Spencer's arrest all support the conclusion that the officers had probable cause to arrest him. The officers were on the

lookout for a gray vehicle that was reportedly involved in a robbery. When they saw a vehicle matching the description, they began to pursue it and it sped off, turned the wrong way down a one-way street, nearly hit a pedestrian, and ultimately crashed into a garage. *See, e.g.*, (Tr. at 41, 44, 93.) In addition to a description of the make and model of the vehicle, the officers were given physical descriptions of the suspects. *See, e.g.*, (*id.* at 42–43, 91.) After finding the vehicle they had been pursuing, which matched the description provided, crashed into a garage, the officers quickly cordoned off the area in an attempt to contain any nearby suspects. (*Id.* at 51–53.) Soon thereafter, officers witnessed two men attempting to flee. (*Id.* at 95–96.)

The officers were able to quickly apprehend one of the men, who turned out to be Farah and who matched the description of one of the men as described by eyewitnesses to the robbery. (*Id.* 97.) The other man evaded capture for approximately twenty to thirty minutes. (*Id.* at 76, 148.) In the interim, officers received additional and more accurate information regarding the suspect's description. (*Id.* at 10–14, 57.) Eventually, a K9 officer alerted to a scent nearby, and a man matching the second suspect's description was located trying to hide on top of a resident's garage, approximately ten feet off the ground. (*Id.* at 122, 146–148.) This suspect was later identified as Spencer.

These facts are more than sufficient justification to lead a "a person of reasonable caution to believe that an offense . . . had been committed by the person to be arrested." *See United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003); *accord United States v. Johnson*, 535 F.3d 886, 890 (8th Cir. 2008) (finding warrantless arrest was supported by probable cause because suspect matched description of the robber and the suspect was

13

found near the location of the robbery and soon after the event); *United States v. Slipka*, 735 F.2d 1064, 1066 (8th Cir. 1984) (finding warrantless arrest was supported by probable cause because the suspect matched a description and fled law enforcement). As a result, Spencer's arrest was supported by probable cause, any search incident to arrest was lawful, and any items seized as part of that search do not violate Spencer's Fourth Amendment Rights.

### 2. Spencer's Motion to Suppress Statements

#### a. Legal Standard

With respect to a suspect's right against self incrimination enshrined in the Fifth Amendment, the Supreme Court stated that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 473–74 (1966). An officer need not end the interview, however, if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the [*Miranda*] right." *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis in original); *see also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (adopting *Davis*).

The Eighth Circuit has construed this to mean than that "[t]o adequately invoke this right and effectively cut off questioning, a suspect must indicate a clear, consistent expression of a desire to remain silent." *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) (internal quotation marks omitted). Courts must "consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." *Id.* For example, "[b]eing evasive and reluctant to talk

14

in is different from invoking one's right to remain silent." *Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001).

### b.   Analysis

The only statements Spencer points to as expressing his desire to remain silent was his statements to officers prior to being given the *Miranda* warning that "I don't got nothing to say" and that he has "nothing to explain." (Spencer's Mem. in Supp. at 2, 4–8.)  When evaluating whether Spencer invoked his right to remain silent, the Court is mindful that the Eighth Circuit has taken a very stringent view of what it means to articulate "a clear, consistent expression of a desire to remain silent."  For example, in *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016), the court determined that the suspect's statement "I don't want to talk, man" was not an unequivocal statement invoking his right to remain silent, and the interviewing officers were within their rights to continue the interview.  Likewise, in *Johnson*, 56 F.3d at 955, the court determined the suspect's statement that "I don't need to make any statement.  I don't need to say anything" was sufficiently ambiguous not to compel cessation of the interview under *Miranda* and its progeny.

In light of these cases, the Court cannot conclude that Spencer's statement that "I don't got nothing to say" was sufficient to put the interviewers on notice that Spencer was unequivocally invoking his right to remain silent. Another equally reasonable interpretation is that he had no information for the interviewers. *See, e.g.*, *United States v. Ravensborg*, No. 13-cr-194 (MJD/LIB), 2013 WL 5565891, at *4 (D. Minn. Oct. 8, 2013) ("Eighth Circuit case law has held that statements by other defendants very similar

to the one now at issue indicating that a defendant has nothing really to say have been insufficient to invoke one's right to remain silent.") (Brisbois, Mag. J., as adopted by Davis, C.J.). This is borne out in the subsequent questioning when the interviewer asks whether Spencer "[doesn't] have anything to say?" or "[y]ou don't want to talk to us?" *See* (Ex. 12 at 00:52-00:58.) In response, Spencer states he has "nothing to explain." (*Id.* at 00:59.) This, too, does not rise to an unequivocal statement invoking his right to remain silent, again because it may indicate that Spencer simply has no information to offer. *Cf. Ravensborg*, 2013 WL 5565891, at *4. Soon thereafter, the interviewer states that Spencer is under arrest and begins to *Mirandize* him. (Ex. 12 at 1:24-1:28.) Spencer asks why he is under arrest, to which the interviewer responds that he is under arrest for robbery and then continues reciting the rest of Spencer's rights under *Miranda*. (Ex. 12 at 1:29-2:05.)

Because Spencer did not unequivocally invoke his right to remain silent, the interviewer was not obligated to cease the interrogation as required by *Miranda*. *Accord Adams*, 820 F.3d at 323; *Mann*, 246 F.3d at 1100; *Johnson*, 56 F.3d at 955; *Ravensborg*, 2013 WL 5565891, at *4. As a result, Spencer's statements made after he was *Mirandized* should not be suppressed.[5]

---

[5] Spencer also seeks to have his statements suppressed as the tainted fruit of his unlawful arrest. *See* (Nov. 29 Letter.) Because the Court concludes that the arrest was supported by probable cause, this argument also fails. *See Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (stating that suppressing evidence as "fruit of the poisonous tree assumes the existence of a constitutional violation").

### III.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Ahmed Osman Farah's Motion for Suppression of Statements [Doc. No. 37] be **GRANTED** as to the statement that Farah had "just come home" and **DENIED** in all other respects; and

2. Defendant Mario Martell Spencer's Motion to Suppress [Doc. No. 45] be **DENIED**.


Dated: November 30, 2018

                                   *s/ Hildy Bowbeer*
                                    HILDY BOWBEER
                                    United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.